**MORGAN, LEWIS & BOCKIUS LLP**
Sarah E. Bouchard (NJ ID # 02807-1995)
Brandon J. Brigham (NJ ID # 02235-2009)
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5077/4780
sarah.bouchard@morganlewis.com
brandon.brigham@morganlewis.com

*Attorneys for Plaintiff Globus Medical, Inc.*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GLOBUS MEDICAL INC.<br>2560 General Armistead Avenue<br>Audubon, PA 19403<br><br>    Plaintiff,<br><br>  v.<br><br>MADELINE DAVIS<br>200 Autumn Lane, Apt. 312<br>Garfield, NJ 07056<br><br>STRYKER CORPORATION<br>2725 Fairfield Road<br>Kalamazoo, MI 49002<br><br><br>    Defendants. | **Civil Action No. _____**<br><br><br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |

Globus Medical Inc. ("Globus," or "Plaintiff," or "Company"), by and through its undersigned counsel, hereby brings the following Verified Complaint seeking injunctive relief and monetary damages against Defendants Madeline Davis ("Davis") and Stryker Corporation ("Stryker") (collectively, "Defendants")

## FACTUAL ALLEGATIONS

**A.    Globus Medical's Background and Company Information**

12.    Globus, a leading musculoskeletal implant manufacturer, is driving significant technological advancements across a complete suite of spinal products.  Founded in 2003, Globus's single-minded focus on advancing spinal surgery has made it the fastest growing company in the history of orthopedics. Globus is driven to utilize superior engineering and technology to achieve pain free, active lives for all patients with spinal disorders.

13.    Developing cutting-edge technology is critical to Globus's success in a very competitive business environment.  Globus is known in the industry as having some of the most innovative products in its space.

14.    Globus is in a highly competitive market.  Globus markets its products throughout the United States and abroad and competes throughout the world with other spinal product manufacturers, including Stryker.

15.    Globus engages in diverse activities to further the advancement of patient care by working with educators, researchers and volunteers to advance knowledge, understanding and delivery of medical care.

16.    The Globus team uses an iterative development process to ensure delivery of a broad range of clinically relevant solutions to the operating room with a pace and quality that is unmatched in the industry.  Central to

4

Globus's efforts are committed engineer-machinist teams that incorporate clinical insights from surgeons during development, testing, evaluation and manufacturing of its products.

17.   Globus invests millions of dollars annually in resources to develop its technology, systems and products.

18.   Given the innovation that Globus brings and the investment that it makes in its business, maintaining the confidentiality of Globus' proprietary information and trade secrets is critical to its business success and to prevent competitors or would-be competitors from gaining an unfair advantage.

19.   To protect its business relationships and its confidential information, Globus requires all of its employees, as a condition of employment, to execute non-compete and non-disclosure agreements upon commencing employment.

20.   At the termination of employment, Globus requires its employees to return, and not retain copies of, all correspondence files, business files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other material that contain any of this information and other similar information upon separation from Globus' employment.

5

**B.    Davis's Extensive Knowledge of and Access to Globus' Confidential and Proprietary Information**

21.    In connection with Davis's duties for Globus, she acquired trade secrets, proprietary information and confidential information regarding Globus' product specifications, designs and attributes; costs and pricing information; manufacturing methods and quality systems; business and marketing plans and programs and launch strategies; customer lists and sales information; budgets, forecasts, product sales and related information; research and testing data, unique product development, regulatory and quality processes, business strategies, and products and services that are soon to launch, in production, or in the Globus pipeline.

22.    Globus maintained and continues to maintain such information in the strictest confidence.  Among the precautions Globus takes is to communicate to all employees that such information should be kept confidential, used only as authorized and should not be communicated to third parties or competitors of Globus.

23.    Furthermore, Globus has all of its employees execute non-disclosure agreements upon commencing employment.

24.    Davis has been exposed to, had substantial access to, possesses, and frequently used trade secrets, proprietary information and confidential information of Globus.

6

25.     She also participated in meetings with management at which such trade secrets, proprietary information and confidential information as sales, marketing, technology, product development, manufacturing, and pricing information were discussed.

26.     Such information is not readily available through any independent source, nor has there been any public disclosure of such trade secrets, proprietary information and confidential information by any individual or entity including, but not limited to, Globus, or any of its affiliates or its or their respective officers, employees, agents or representatives.

27.     Upon information and belief, Davis inevitably will use Globus's Confidential Information to benefit himself and Stryker at the expense of Globus.

28.     Upon information and belief, Davis will continue to use Globus's Confidential Information if she is not enjoined from doing so.

29.     Globus has actively and diligently protected its trade secrets, proprietary information and confidential information, and employees execute non-disclosure agreements acknowledging Globus' business methods are confidential and not to be disclosed to others.

7

30.     Davis acquired her knowledge of such information only through her employment with Globus, and under circumstances giving rise to a duty to maintain the secrecy and integrity of such information.

### C.     Davis's Employment With Globus as an Engineer

31.     In October 2015, Globus hired Davis as an Associate Project Engineer.  In January 2017, Globus promoted Davis to Project Engineer.

32.     Project Engineers at Globus are involved in the research and development of Globus products, both current products (for the purpose of further enhancements and "next generation" innovation) and future, pipeline products.  All Globus engineers regularly bring a product from concept through design, prototyping, development testing, design verification, validation, manufacturing, FDA approvals, production introduction and post-introduction monitoring.  More specifically, Project Engineers, *inter alia*, obtain market feedback from spine surgeons and other customers; design and develop instruments and implants; work with Globus in-house prototype shop and outside vendors for rapid prototyping and evaluation; work with marketing and product managers to develop forecasts and market plans; assist in the writing of regulatory applications to the FDA and other regulatory bodies; work with Globus' operations department to setup department manufacturing and/or purchasing as appropriate; assist in product introductions through sales training and customer calls/visits' and research market and

8

competition on an ongoing basis to ensure Globus has cutting edge technology in all markets entered.  Exhibit 1, Globus Engineer Position Description.

33.   As an Associate Project Engineer and Project Engineer in the in Biomaterials group, Davis was responsible for all engineering functions of the Globus products to which she was assigned.  This includes bringing the products from idea/concept through design, prototyping, development testing, design verification and validation, manufacturing, FDA approvals, product introduction and post-introduction monitoring.  Davis also worked with spine surgeons and performed other functions to ensure high-quality and on-time production introductions.

34.   Prior to her employment with Globus, Davis had no experience in the medical device industry.

35.   As such, Globus not only provided Davis her first introduction to and education in the world of designing and developing spinal medical devices while she worked with Globus, but Globus also provided Davis with extensive pre-employment training, including 40 hours of one-on-one training and 80 hours of classroom training.  This training provided Davis with an in-depth education about the spine and related anatomy, as well as Globus' business model and its market for products.

9

36.     Solely as a result of her position and employment with Globus, Davis developed a significant amount of knowledge regarding spine, orthopedic and trauma products, and products in Globus' product development pipeline.

37.     During her employment, Davis worked on several different Globus products, including Globus FORGE™.  FORGE™ is a corticocancellous spacer designed to provide a natural option for anterior cervical fusion.

38.     In the course of her employment, Davis was exposed to, and regularly worked with, Globus's most confidential information, including technical and design data, product manufacturing methods, sales, budget, and forecast information; special customer requirements; confidential competitive information, performance data, information related to future products and pipeline information; pricing and cost information; improvement ideas; and consulting surgeons' product feedback (which is protected through an agreement with the surgeons).

39.     The various Globus Product Development teams are interactive and cross-functioning, executing Globus's core philosophy of a "team" approach to product development.  Globus maintains an interdisciplinary approach in which engineers in one area are exposed to products and projects in another. Consequently, although Davis worked within the Biomaterials group, she was regularly exposed to product development, design, and marketing information from other Globus engineering groups, including the Anterior Interbody Fusion Group,

10

Posterior / Lateral; Minimally Invasive; Plating; Emerging Technology;

Degenerative / Deformity and International.  For example:

        a.    Globus holds Product Development Quarterly Update

Meetings attended by engineers from all Globus's work groups, among other

professionals.  At these meetings, the participants present on the products on which

they are working, discuss pipeline activities, address patent issues, and generally

discuss a host of issues involving the Company's most sensitive and product

specific information.

        b.    Additionally, Globus has its engineers act as

"Independents" charged with reviewing the products and product developments on

which other groups are working.

        c.    Globus also runs regular "Brainstorming Sessions" in

which groups of engineers, among other professionals, are gathered and charged

with identifying and developing ideas for new and improved products.  Upon

information and belief, Dais was a regular participant in these sessions and, thus,

was exposed, and worked with, confidential information related to numerous other

products and potential products.

        40.    This broad exposure to Globus's product lines and trade secret

information is one of the reasons that Globus requires all of its employees,

including engineers and others with product development responsibility, as a

11

condition of employment, to execute non-competition and non-disclosure

agreements.

### D. Davis's No Competition and Non-Disclosure Agreement

41.    Upon commencing employment with Globus, Davis executed a

No Competition and Non-Disclosure Agreement (the "Agreement").  A copy of

Davis's Agreement is attached hereto as Exhibit 2.

42.    Davis agreed, *inter alia*, that for eighteen months after her

employment terminated, she would not "engage in any Competitive Activity with

any Competing Company."

43.    The Agreement defined Competitive Activity "as participation

in, performance of services for, employment by, ownership of any interest in, or

assistance, promotion or organization of, any Competing Company."

44.    The Agreement defined "Competing Company" as "any person,

partnership, corporation firm, limited liability company, association or other

business entity , other than Globus, that either (a) manufacturers, designs,

develops, sells, markets or distributes products or services used in robotics,

orthopedic surgery, neurosurgery, spine surgery, and related therapies, or (b)

manufactures implants, instruments, components parts, cases and trays, and other

equipment in and for the medical device industry . . ."

12

45.     Davis was not assigned to any geographic territory or customer accounts, and thus the Agreement defined "NCND Territory" as worldwide.

46.     In addition to the foregoing, the Agreement prohibits Davis from using or disclosing any of Globus' Confidential Information.

47.     The Agreement defined Confidential Information to include, *inter alia*, "product specifications and attributes, pricing information, technology development plans, . . . models, prototypes, [and] schematics . . . ."

48.     The Agreement also stated that it "shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the principles thereof regarding conflicts of laws."

49.     Davis further acknowledged that a breach of these covenants would entitle Globus to, *inter alia*, immediate injunctive relief.

**E.     Davis Violates the Agreement and Commences Employment with Globus' Direct Competitor Stryker**

50.     Stryker is a director competitor of Globus.  Like Globus, Stryker invents, designs, and manufactures spine-related instruments and implants.

51.     On or about November 1, 2017, Globus learned that Davis had obtained a position with Stryker, in direct violation of her Agreement. Specifically, Davis informed Globus personnel that she was resigning her position with Globus to take a position in Stryker's spine division.

13

**F.**     **Davis Was Informed of Her Unlawful Conduct**

52.     On November 9, 2017, Globus' counsel sent a letter to Davis
via email and Federal Express informing her of Globus's belief that she was in
violation of her non-compete and that it would like to resolve this matter without
this Court's intervention.  A copy of the letter is attached hereto as Exhibit 3.

53.     In the letter, Globus also informed Davis that time was of the
essence and that if the parties could not resolve this matter prior to November 13,
2017, Globus would file suit to protect its legitimate business interests.

54.     Likewise, Globus sent Stryker a letter via email and Federal
Express informing it of Globus's belief that Davis was in violation of her non-
compete and that it would like to resolve this matter without this Court's
intervention.  Globus also informed Stryker that time was of the essence and that if
the parties could not resolve this matter prior to November 13, 2017, Globus would
file suit to protect its legitimate business interests.  A copy of the letter is attached
hereto as Exhibit 4.

55.     On November 14, 2017, Stryker's counsel responded that Ms.
Davis would not be working in a competitive capacity because her position would
be "Advanced Operations Project Engineer" and she would be "responsible for the
design transfer and validation of an orthopedic product that has already been
designed by Stryker."  A copy of that letter is attached hereto as Exhibit 5

14

56.     The same day, Globus's counsel responded and outlined why
that assurance was insufficient to protect Globus's legitimate business interests.
Globus's counsel noted that every product undergoes design changes as the
product transfers from a prototype to manufacture.  Ms. Davis's role, therefore,
would require her to be involved in the design process for new products that would
directly compete with Globus.  Globus's counsel noted it would bring suit by
November 17, 2017 if the parties could not reach an accord.  A copy of that letter
is attached hereto as Exhibit 6.

## COUNT I (AGAINST DAVIS)
## BREACH OF CONTRACT

57.     The preceding paragraphs are incorporated by reference as if
fully set forth herein.

58.     The Agreement is valid and enforceable as written because it
meets Pennsylvania state contract law requirements, reasonably protects and
advances Globus' legitimate business interests, and the balance of the equities
favors enforcement of the Agreement.

59.     Davis continues to be bound by the Agreement.

60.     Globus fulfilled its obligations under the Agreement by, *inter
alia*, agreeing to employ Davis and providing her with Confidential Information.

15

61.     By the conduct described above, Davis has materially breached the express provisions of the Agreement, including, but not limited to, paragraphs 1.3, 2.1, and 2.3 of the Agreement.

62.     As a direct and proximate result of Davis's breach of the Agreement, Globus has suffered and will continue to suffer harm and injury, including, but not limited to, loss of trade secrets, confidential information, competitive advantage, goodwill, income, revenue, customers, and market share.

63.     As a direct and proximate result of Davis's breach of contract, Globus has suffered, and will continue to suffer, immediate irreparable harm unless Davis is enjoined as requested below.

64.     Greater injury will be inflicted on Globus by the denial of this relief than will be inflicted on Davis by granting of this relief.

### COUNT II (AGAINST DAVIS)
### MISAPPROPRIATION OF TRADE SECRETS - 12 Pa. C.S. § 5308

65.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

66.     Upon information and belief, Davis has misappropriated Globus Confidential Information that qualifies as trade secrets under 12 Pa. C.S. § 5308 without the express or implied consent of Globus.

67.     Davis has used or disclosed or will inevitably use or disclose this information in performing her duties for Stryker.

16

68.    Globus has expended substantial resources in developing its trade secrets for its exclusive benefit.  Globus' trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by any third parties.

69.    Globus does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized disclosure.

70.    Globus communicated its trade secrets to Davis in confidence and with the understanding that they would be used by Davis solely in the conduct of Globus' business.  Davis knew, as evidenced by the Agreement, that Globus intended for all such information to remain confidential and to be used by her solely in the conduct of Globus' business.

71.    As a direct and proximate result of Davis's misappropriation of trade secrets, Globus has suffered, and will continue to suffer, irreparable harm.

72.    As a direct and proximate result of Davis's misappropriation of trade secrets, Globus has suffered substantial damages, the precise amount of which will be determined at trial.

73.    Davis's conduct has been willful, malicious, and outrageous and undertaken with reckless indifference to the rights or interests of Globus.

17

## COUNT III (AGAINST DEFENDANTS)
## UNFAIR COMPETITION

74.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

75.     By virtue of the acts described above, Defendants have wrongfully and unfairly competed with Globus.

76.     As a direct and proximate result of the unlawful actions of Globus has suffered and will continue to suffer harm and injury, including, but not limited to, loss of trade secrets, confidential information, competitive advantage, goodwill, income, revenue, clients, customers and market share.

77.     By virtue of the unlawful actions of Defendants, Globus is threatened with immediate and irreparable harm.

78.     Defendants have committed these acts willfully and maliciously and for the sole purpose of inflicting harm on Globus or to benefit himself at the expense of Globus.

79.     As a direct and proximate result of Defendants' unfair competition, Globus has suffered substantial damages.

## COUNT IV (AGAINST STRYKER)
## INTENTIONAL/TORTIOUS INTERFERENCE
## WITH NO COMPETITION NON DISCLOSURE AGREEMENT

80.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

18

81.    Stryker's solicitation and employment of Davis, despite knowing her Agreement with Globus, is a common law violation of intentional/tortious interference with contract.

82.    Globus has a protectable interest in its confidential, proprietary and trade secret information, which the Agreement protects.

83.    But for Stryker's tortious interference, taken without justification, the Agreement would not have been breached.

84.    The foregoing tortious conduct was authorized, ratified, or consented to by managerial employees of Stryker.

85.    Stryker intentionally engaged in such tortious conduct with malice and/or conscious and deliberate disregard of Globus's interests.

86.    As a direct and proximate result of Stryker's tortious conduct, Globus has suffered, and will continue to suffer, immediate and irreparable harm unless enjoined.

87.    As a direct and proximate result of Stryker's tortious conduct, Globus has suffered, and will continue to suffer, substantial damages.

88.    Stryker's actions have been willful and outrageous and undertaken with reckless indifference to the rights of Globus.

## JURY DEMAND

Globus demands a trial by jury as to all claims that may be tried to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Globus requests the following relief:

(a)     That Davis be enjoined, preliminarily until hearing, and thereafter permanently through May 8, 2019, from being employed by or otherwise providing services to Stryker;

(b)     That Davis be enjoined, preliminarily until hearing, and thereafter permanently, from further breaches of the Agreement;

(c)     That Stryker be enjoined, preliminarily until hearing, and thereafter permanently, from interfering with the Agreement;

(d)     That Defendants be enjoined, preliminarily until hearing, and thereafter permanently, from retaining, using, or disclosing any of Globus' trade secrets, proprietary information or confidential information;

(e)     That Defendants be directed to immediately return to Globus all company property, as well as all copies of the Company's documents, electronic files, and information;

(f)     That Defendants be ordered to promptly produce copies of all such Company documents, electronic files, and information during the expedited discovery process related to Plaintiff's Petition for Preliminary Injunction;

20

(g)    That Globus be awarded actual, compensatory, and punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, including, but not limited to, all costs of the investigation into Defendants' unlawful actions;

(h)    That Globus be awarded such other and further necessary and proper relief as the Court may deem just and proper.

Dated: November 20, 2017

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP
By: _____
        Sarah E. Bouchard
        Brandon J. Brigham
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5077/4780

21

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of

any other action pending in any court or of any pending arbitration or

administrative proceeding.

Dated November 20, 2017

MORGAN, LEWIS & BOCKIUS LLP
By: _Sarah Boucher_
Sarah E. Bouchard
Brandon J. Brigham
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5077/4780

**<u>VERIFICATION</u>**

I, Mark Adams, hereby verify under penalty of perjury that I am the Director, Product

Development, Interbody Fusion for Globus Medical, Inc.  I further verify that the factual

information as set forth in Plaintiff Globus Medical, Inc.'s Verified Complaint for Injunctive

Relief and Damages is true and correct to the best of my knowledge, information and belief.

Dated: November 20, 2017

# EXHIBIT 1



**GLOBUS**
**M E D I C A L**

| | |
|---|---|
| Title: | **Project Engineer** |
| Job Classification: | Full-time/Exempt |
| Department: | Product Development |
| Reports To: | Group Engineering Manager |
| Location: | Audubon, PA |

The Project Engineer will be responsible for all engineering functions of their product lines. This includes bringing a product from idea/concept through design, prototyping, development testing, design verification and validation, manufacturing, FDA approvals, product introduction and post introduction monitoring. This individual will work with surgeons and all other functions of the company to ensure high quality and on-time product introductions. This team player will have experience with multi-tasking in a high energy fast paced environment.

Job Responsibilities

- Obtain market feedback from surgeons and other customers to determine functional and design specifications for new product development.
- Create and maintain project plans and FDA complaint Design history Files (DHF) for each project.
- Management of all aspects of project to ensure timely completion of tasks while remaining in full compliance with Globus quality system and other applicable regulatory bodies.
- Design and develop instruments and implants using Pro/E software.
- Working with in-house prototype shop and outside vendors for rapid prototyping and evaluation.
- Performing design verification and validation activities to ensure designs meet specifications.
- Working with marketing and product managers to develop forecasts and market plans.
- Assisting in the writing of regulatory applications to the FDA and other regulatory bodies.
- Working with the operations department to setup manufacturing and/or purchasing as appropriate for each project.
- Assisting in product introductions through sales training, customer calls/visits, etc.
- Maintaining diligent post introduction monitoring to address and customer requests for changes.
- Researching market and competition on an ongoing basis to ensure that Globus has cutting edge technology in all markets entered.

Globus Medical is an Equal Opportunity Employer.  EOE M/F/D/V

Rev. 12/12/2016



Qualifications

- Three to seven years of mechanical design engineering experience preferably in the medical device field.
- Proficiency in Pro/E software for design and drafting required.
- Proven leader of people with strong self-starting skills.
- Ability to work in fast paced environment. Multi-tasking abilities required for successful job completion.
- Well organized, detail oriented and team player capable of working in a deadline dictated environment.
- Ability to adequately represent and reflect company philosophy to customers, investors, regulatory agencies, and industry peers.
- Proficient in preparation of reports and budgets.
- Bachelor's degree in Mechanical Engineering required. 4 years of additional design experience may suffice in lieu of a degree.
- Working knowledge of Microsoft Office.

Physical Demands

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job.  The employee is occasionally required to sit; climb or balance; and stoop, kneel, crouch or crawl. The employee must frequently lift and/or move up to 10 pounds and occasionally lift and/or move up to 25 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception and ability to adjust focus.

Other Duties

Please note this job description is not designed to cover or contain a comprehensive listing of activities, duties or responsibilities that are required of the employee for this job. Duties, responsibilities and activities may change at any time with or without notice.

Globus Medical is an Equal Opportunity Employer.  EOE M/F/D/V

Rev. 12/12/2016



Employee signature below constitutes employee's understanding of the requirements, essential functions and duties of the position.

Employee: _____ Date:_____

Globus Medical is an Equal Opportunity Employer.  EOE M/F/D/V

Rev. 12/12/2016

# EXHIBIT 2



**GLOBUS MEDICAL, INC.
NO COMPETITION AND NON-
DISCLOSURE AGREEMENT**

This No Competition and Non-Disclosure Agreement ("NCND Agreement") is made and entered into between Globus Medical, Inc., its subsidiaries and divisions (collectively the "Company") and ____Madeline Davis____ effective October 19th, 2015.

## ACKNOWLEDGEMENTS & DEFINITIONS

A. The Company is engaged in the design, development, production, manufacture, distribution and sale of musculoskeletal products and services related to robotics, orthopedic surgery, neurosurgery, spine surgery and related therapies, as well as the manufacture of implants, instruments, component parts, cases and trays and other equipment in and for the medical device industry (collectively "Products").

B. Employee performs services for and on behalf of the Company, either as a direct employee or through an independent service contract, for which Company compensates Employee, which may include services in connection with promotion or sale of Products.  Company desires to employ and/or continue to employ Employee, provided that as an express condition of such employment or continued employment, Employee enters into this NCND Agreement with Company.  In the case of an Employee who is signing this NCND Agreement after the inception of his/her employment relationship with the Company, Employee acknowledges that the Company has provided Employee with valuable consideration in exchange for signing this NCND Agreement.

C. The parties agree that this NCND Agreement is supported by valuable consideration, that mutual promises and obligations have been undertaken by the parties to it, and that this NCND Agreement is entered into voluntarily by the parties.

D. For purposes of this NCND Agreement the Employee's performance of services and receipt of compensation from the Company will be defined as the Employment Agreement (the "Employment Agreement") between the Employee and the Company, whether or not a written employment agreement exists between the Employee and the Company governing said services and compensation.

E. For purposes of this NCND Agreement, the term of the Employment Agreement ("Employment Agreement Term") shall be defined as the time period during which Employee performs services for or on behalf of the Company.

1

4/15

F. For purposes of this NCND Agreement, the NCND Territory ("NCND Territory") shall be defined as any geographic area assigned to the Employee within the most recent 12 months of the Employment Agreement Term. In the event that the Employee has been assigned certain Hospitals (as defined below) and/ or Medical Personnel (as defined below) and not a geographic area within the most recent 12 months of the Employee Agreement Term, the NCND Territory shall be defined as any Hospitals and/or Medical Personnel to which the Employee was assigned within the most recent 12 months of the Employee Agreement Term. In the event the Employee has not been assigned to specific Hospitals and/or Medical Personnel or to a specific geographic region within the most recent 12 months of the Employee Agreement Term, the NCND Territory shall be defined as worldwide.

G. For purposes of this NCND Agreement, Medical Personnel ("Medical Personnel") shall be defined as orthopedic surgeons, neurosurgeons, physicians, nurses and other medical personnel involved in the implantation, purchase or other handling and usage of the Products, including but not limited to employees, agents or persons who control, direct or influence purchasing decisions of any Hospitals.

H. For purposes of this NCND Agreement, Hospitals ("Hospitals") shall be defined as hospitals, surgery centers, medical centers and other health care facilities that purchase Products and the location at which Medical Personnel perform services related to the purchase, implantation or other handling and usage of the Products.

I. Employee will have access to confidential, proprietary and trade secret information ("Confidential Information") belonging to the Company, including Confidential Information developed by the Employee (see **Section 2.2** below). Such Confidential Information includes, but is not limited to: customer lists; product specifications and attributes; pricing information; technology development plans; forecasts; financial information; sales strategies and techniques; business records; models; prototypes; schematics; manuals; handbooks; literature; vendors; business terms between Company and suppliers; business terms between Company and Hospitals; business terms between Company and distributors; business terms between Company and Medical Personnel. Employee acknowledges that Company owns such Confidential Information and that Employee has no ownership interest in such Confidential Information. Furthermore, Employee acknowledges that the disclosure of such Confidential Information to unauthorized third parties, including Competitive Companies (as defined below) would cause great and irreparable harm to the Company. Furthermore, Employee acknowledges that Company has a legitimate business interest in the protection of the Confidential Information.

## NO COMPETITION & NO SOLICITATION COVENANT

1.1   Competitive Activity. For purposes of this NCND Agreement, Competitive Activity ("Competitive Activity") shall be defined as participation in, performance of services for, employment by, ownership of any interest in, or assistance, promotion or organization of, any Competing Company. "Competing Company" is defined as any person, partnership, corporation, firm, limited liability company, association or other business entity, other than Globus, that either (a) manufactures, designs, develops, sells, markets or distributes products or

2

4/15

services used in robotics, orthopedic surgery, neurosurgery, spine surgery and related therapies, or (b) manufactures implants, instruments, component parts, cases and trays and other equipment in and for the medical device industry; provided that the purchase for investment of not more than five (5%) percent of the total capital stock of such Competing Company whose stock is publicly traded shall not constitute a Competitive Activity.

1.2   No Competition Period.  For purposes of this NCND Agreement, the No Competition Period ("No Competition Period") shall be defined as the time period encompassing both the Employment Agreement Term and the 18-month period immediately after the termination of the Employment Agreement.

1.3   No Competition or Solicitation Covenant.  During the No Competition Period, Employee agrees not to engage in any Competitive Activity for any Competing Company.

If, during the last year of employment with Company, Employee was engaged exclusively in non-management field sales activities including selling, soliciting the sale or supporting the sale of Products through contact with Hospitals or Medical Personnel, then Employee's covenants under this paragraph are as follows: Employee agrees not to engage in any Competitive Activity with any Hospitals or Medical Personnel during the Employment Agreement Term.  In addition, Employee agrees not to engage in any Competitive Activity with any Hospitals or Medical Personal during the No Competition Period in the NCND Territory.  Furthermore, during the No Competition period, Employee agrees not to directly or indirectly, either for the Employee's benefit or the benefit of another entity, solicit, call on, interfere with, attempt to divert, entice away, sell to or market to any Hospital in the NCND Territory, or to any Medical Personnel in the NCND Territory who perform any services related to the implantation or other handling and usage of the Products (regardless of whether such services are also provided by the Medical Personnel outside the NCND Territory).  By way of example, if a physician performs services at two different Hospitals, one within and one outside the NCND Territory, the restrictions in this paragraph prohibit the Employee from directly or indirectly soliciting, calling on, interfering with, or attempting to divert, entice away, sell to or market to the physician at either the Hospital within the NCND Territory or the Hospital outside the NCND Territory.

1.4   No Solicitation of Company's Employees or Employees.  During the No Competition Period, Employee agrees not to directly or indirectly, either for the Employee's benefit or the benefit of another entity, employ or offer to employ in any capacity, contact or recommend for employment with a Competing Company, contact or recommend for the purposes of entering into a contractual relationship with a Competing Company, or solicit, call on, interfere with, or attempt to divert, or entice away, any individuals who are or were employees, independent contractors, representatives or employees of the Company or of any of the Company's distributors at any time within the preceding 12 months.

3

4/15

## NON-DISCLOSURE COVENANT

2.1 <u>Use of Confidential Information</u>. Both during the Employment Agreement Term and after the termination of the Employment Agreement, Employee agrees not to use any Confidential Information except as required to perform its obligations as an Employee of the Company, or disclose to any individual, corporation, partnership or other entity any Confidential Information belonging to the Company, unless Employee is required to make such disclosure pursuant to judicial process. Notwithstanding the foregoing, immediately upon receipt of subpoena or other judicial process requiring disclosure of Confidential Information belonging to Company, Employee shall deliver written notice and a complete copy of such process to the Company and before responding to such process, allow the Company to take such action as they may deem appropriate under the circumstances to protect their interests in the Confidential Information requested for disclosure.

2.2 <u>Development of Intellectual Property</u>. Employee may make, discover or develop inventions, ideas, trade secrets, financial materials, computer programs, discoveries, developmental improvements, know-how, processes and devices related to or used in the conduct of Employee's performance of services for and on behalf of the Company ("Developments"). The Employee agrees to disclose fully and promptly to the Company any said Developments. Furthermore, Employee agrees that the Company is the sole and exclusive owner of said Developments; the Employee retains no ownership in said Developments; and said Developments become part of the Company's Confidential Information for purposes of this NCND Agreement. Company and Employee agree that if the Developments or any portion thereof are copyrightable, it shall be deemed "work for hire" as such term is defined in the U.S. Copyright Act. The Employee shall execute and deliver to the Company any and all licenses, applications, assignments and other documents and take any and all actions that the Company may deem necessary or desirable to protect Company's ownership rights in said Developments.

2.3 <u>Handling and Return of Confidential Information</u>. Employee shall not physically or electronically remove or make copies of any Confidential Information owned by the Company, except as required by the Employee to properly fulfill their responsibilities as an Employee of the Company and with management permission. Upon the termination of the Employment Agreement, Employee shall immediately return to the Company any and all Confidential Information in their possession, including any and all copies of said Confidential Information.

2.4 <u>Fiduciary Duties</u>. Employee agrees that Employee shall treat all Confidential Information entrusted to Employee by Company as a fiduciary, and Employee accepts and undertakes all the obligations of a fiduciary, including good faith, trust, confidence and candor, to maintain, protect and develop Confidential Information for the benefit of Company.

2.5 <u>Confidential Information of Others</u>. Employee hereby represents and warrants to the Company that Employee is not bound by any agreement, understanding or restriction, (including, but not limited to any covenant restricting competition or agreement related to the confidential and proprietary information and trade secrets of any third party), that is inconsistent with or prevents or limits the Employee's ability to fulfill his/her obligations under the Employment Agreement.

4

Furthermore, Employee hereby represents and warrants to the Company that the execution and performance of the Employment Agreement will not result in or constitute a breach of any term or condition of any other agreement the Employee is bound by. In performance of his/her duties and obligations under the Employment Agreement, Employee agrees not to disclose the confidential and proprietary information or trade secrets of any third party to the Company.

### REMEDIES

3.1   Right to Specific Relief. Company and Employee recognize and acknowledge that the limitations set forth in this NCND Agreement are properly required for the adequate protection of the business of the Company, and that violation of any of the provisions of this NCND Agreement will cause irreparable injury for which money damages are neither adequate nor ascertainable. Accordingly, Company shall have the right to have the provisions of this NCND Agreement specifically enforced by a court of competent jurisdiction, in addition to any other remedies which Company may have in equity or at law, and Employee hereby consents to the entry of an injunction or other similar relief without the necessity of posting a bond or other financial insurance. Furthermore, Company shall be entitled to recover its costs and expenses (including reasonable attorneys' fees) incurred in enforcing its rights under this NCND Agreement.

If a dispute arises under this NCND Agreement, Employee shall have a duty to immediately notify the Company of the name, address and telephone number of Employee's legal counsel. In the event Employee fails to provide this information, Employee agrees that the Company may seek a temporary restraining order to enforce the provisions of this NCND Agreement on an ex parte basis. Employee acknowledges that the Company's recovery of damages will not be an adequate means to redress a breach of this NCND Agreement. Nothing contained in this paragraph, however, shall prohibit the Company from pursuing any remedies in addition to injunctive relief, including recovery of damages.

3.2   Right to Recover Attorneys' Fees and Costs. (a) If the Company seeks a restraining order, an injunction or any other form of equitable relief, and recovers any such relief, Company shall be entitled to recover its reasonable attorneys' fees, court costs, and other costs incurred obtaining that relief (even if other relief sought is denied). (b) If the Company obtains a final judgment of a court of competent jurisdiction, pursuant to which Employee is determined to have breached his/her obligations under this Agreement, the Company shall be entitled to recover, in addition to any award of damages, its reasonable attorneys' fees, costs, and expenses incurred by the Company in obtaining such judgment. Any relief awarded under this subparagraph (b) shall be in addition to any other relief awarded under subparagraph (a). The parties agree that the provisions of this paragraph are reasonable and necessary.

### OTHER MATTERS

4.1   Condition to Seeking Subsequent Employment. Employee agrees to show a copy of this NCND Agreement to any Competing Company with whom Employee interviews during the Employment Agreement Term or with whom Employee interviews within the 18 month period

5

4/15

immediately following the termination of the Employment Agreement Term.

4.2     <u>Entire Agreement</u>. This NCND Agreement constitutes the entire agreement between the parties relating to the specific matters covered by this NCND Agreement and supersedes all prior agreements, whether written or oral. No modifications or waiver of any part of this NCND Agreement shall be binding upon either party unless in writing.

4.3     <u>Waiver</u>. The waiver of a breach of any provision of this NCND Agreement by any party shall not operate or be construed as a waiver of any provision of this NCND Agreement or consent of any subsequent breach.

4.4     <u>Severability</u>. If any term or provision of this NCND Agreement shall be determined invalid or unenforceable to any extent or in any application, then the remainder of this NCND Agreement shall not be affected thereby, and such term or provision shall be deemed modified to the minimum extent necessary to make it consistent with applicable law, except to such extent or in such application, shall not be affected thereby, every term and provision of this NCND Agreement as so modified if necessary, shall be enforced to the fullest extent and in the broadest application permitted by law .

4.5     <u>Governing Law</u>. In order to maintain uniformity in the interpretation of this NCND Agreement the parties have expressly agreed that this NCND Agreement, the parties' performance hereunder and the relationship between them shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the principles thereof regarding conflicts of laws.

4.6     <u>Transfer or Assignment; Binding Nature</u>. Company may transfer or assign its rights and obligations pursuant to this NCND Agreement to its successors or assigns. Employee shall not assign any of his or her rights or delegate any of his or her duties or obligations under this NCND Agreement. This NCND Agreement shall be binding upon and inure to the benefit of the parties hereto and to the Company's successors and assigns.

4.7     <u>Tolling</u>. Employee understands and agrees that in the event of any breach of his/her obligations under paragraphs 1.3 or 1.4 of this NCND Agreement, the No Competition Period shall be automatically tolled for the amount of time the violation continues.

6

4/15

IN WITNESS WHEREOF, the undersigned have executed this NCND AGREEMENT, intending to be bound under their seals, effective as of the day and year set forth above.

COMPANY:                                    EMPLOYEE:

By: _Joan Huggins_                          By: _Madelin Danris_

DATE: _10/19/15_                            DATE:
                                            _10/19/2015_

7

4/15

# EXHIBIT 3

# Morgan Lewis

**Sarah E. Bouchard**
Partner
+1.215.963.5077
sarah.bouchard@morganlewis.com

November 9, 2017

**VIA EMAIL AND FEDERAL EXPRESS**

Madeline Davis
233 E. King Street
APT 431
Malvern, PA 19355

Dear Ms. Davis:

I am counsel for Globus Medical, Inc. ("Globus").  As you are aware, you voluntarily terminated your employment with Globus on November 1, 2017.  Although your employment has ended, you have continuing obligations under the Non-Competition and Non-Disclosure Agreement (the "Agreement") you signed with Globus on October 19, 2015.  A copy of the Agreement is attached for your reference.  This Agreement forbids you from using or disclosing Globus's confidential, proprietary or trade secret information.  It also prohibits you, for eighteen months post-employment, from competing with Globus either directly or indirectly.  Globus takes your continuing contractual and legal obligations seriously and expects you to abide by them.

In your resignation correspondence, you indicated that you accepted employment with Stryker, a competitor of Globus.  We are concerned because the job duties you have at Stryker may threaten Globus' legitimate business interests, including revealing its highly confidential trade secret information.  As a Globus product engineer, you were significantly involved in product development and had access to highly sensitive, management-level product development information.  For example, through your participation in product development meetings, you had access to highly confidential, proprietary, and trade secret information regarding Globus' product development pipeline for not only biologics and spine-related products, but also other applications.

Globus has retained me to explore their legal options.  We strongly encourage you to reach out to legal counsel to obtain representation.  We ask that you inform us of the date you commenced employment (or a contracting relationship) with Stryker and provide a detailed description of the nature of your responsibilities at Stryker so that we can determine whether you can perform your job with Stryker without violating your obligations to Globus.  Due to the gravity of this matter and the sensitive information at issue, we ask that you provide this information by **Monday, November 13** or we will pursue our legal options**.**

Should you breach any provision of the Agreement, Globus will seek an injunction restraining such breach and damages.  If you have taken any action that you believe are in violation of your

**Morgan, Lewis & Bockius LLP**

1701 Market Street
Philadelphia, PA  19103-2921         ☎ +1.215.963.5000
United States                        🖷 +1.215.963.5001

Madeline Davis
November 9, 2017
Page 2

obligations, we ask that you notify us immediately.  Further, we hereby place you on notice that
litigation regarding these matters is reasonably anticipated and advise you of your continuing
obligation to preserve all documents and information relating to this matter until its final
resolution.   You may not destroy, delete, conceal, or alter relevant paper or electronic documents,
files and other relevant data relating to:

- The recruiting and hiring of you by Stryker;

- Communications between you and any former or current Globus employee;

- Globus and/or its customers, prospective customers, contracts, and/or business
  opportunities;

- Your job duties at Stryker;

- Any contracts or agreements  between you and Stryker to perform services, promote
  or distribute Stryker products; and

- Documents and information taken from Globus.

Failure to comply with this notice may result in severe sanctions and potential liability for spoliation
of evidence.

Your duty to preserve documents and information extends to all relevant paper documents,
electronic data, and electronic media.  The law requires that you take every reasonable step to
preserve all relevant information from any computer systems, removable electronic media, and
other locations.  This includes, but is not limited to, email and other electronic communication,
word processing documents, spreadsheets, databases, calendars, telephone logs, information
contained in business contact manager programs, internet usage files, and network access
information.  You must also preserve the following platforms of electronic data containing relevant
information: databases, networks, computer systems, including legacy systems (hardware and
software), servers, archives, backup or disaster recovery systems, disks, drives, cartridges and
other storage media, CDs, DVDs, portable thumb and flash drives, hard disks, ZIP disks, laptops,
personal computers, internet data, personal digital assistants (PDAs), handheld wireless devices,
mobile telephones, paging devices, and audio systems (including voicemail), hard drives, laptops,
PDA's, computer servers, and other electronic processing devices.

As used here, email includes emails sent or received by you on Stryker email systems or personal
email accounts (such email accounts maintained through gmail, yahoo, hotmail, Blackberry
messenger or any other internet service provider or social media network such as Facebook and
LinkedIn).   In addition, documents include text messages through any telephone service
provider.  You must not overwrite, delete or destroy relevant electronic data on any computer or
electronic storage location and you must take steps to protect such data from being deleted or
destroyed in the normal course of business operations or otherwise.

Please contact us or have your counsel contact us promptly.

Madeline Davis
November 9, 2017
Page 3

Sincerely,

Sarah E. Bouchard

SEB//bjb

# EXHIBIT 4

# Morgan Lewis

**Sarah E. Bouchard**
Partner
+1.215.963.5077
sarah.bouchard@morganlewis.com

November 9, 2017

**VIA EMAIL AND FEDERAL EXPRESS**

Mercedes Harrison-Thomas
Lead Talent Acquisition, BP
Stryker
325 Corporate Dr.
Mahwah, NJ 07430

Dear Ms. Harrison-Thomas:

I am counsel for Globus Medical, Inc. ("Globus").  We understand that Stryker recently hired Madeline Davis.  As you are aware, Ms. Davis has continuing obligations under the Non-Competition and Non-Disclosure Agreement (the "Agreement") she signed with Globus on October 19, 2015.  A copy of the Agreement is attached for your reference.  This Agreement forbids Ms. Davis from using or disclosing Globus's confidential, proprietary or trade secret information.  It also prohibits her, for eighteen months post-employment, from competing with Globus either directly or indirectly.  Globus takes Ms. Davis's continuing contractual and legal obligations seriously and expects her to abide by them.

We believe that Ms. Davis's employment with Stryker may violate the terms of her Agreement with Globus.  Therefore, we request that you immediately confirm that Ms. Davis's job functions and responsibilities at Stryker are dissimilar to those that she performed for Globus, and that there has been no use of Globus's proprietary information by Stryker or disclosure by Ms. Davis.  In this regard, we will need a detailed description of the nature of Ms. Davis's responsibilities at Stryker, to determine whether she can perform her job with Stryker without violating her obligations to Globus.

Globus has retained me to explore their legal options.  Due to the gravity of this matter and the sensitive information at issue, we ask that you provide a response to this letter by **Monday, November 13** or we will pursue our legal options**.**

I trust that this is enough information for you to commence your inquiries internally.  Accordingly, we hereby place Stryker on notice that litigation regarding these matters is reasonably anticipated and advise Stryker of its continuing obligation to preserve all documents and information relating to this matter until its final resolution.  Stryker may not destroy, delete, conceal, or alter relevant paper or electronic documents (including but not limited to emails and text messages on any personal or business computers or mobile phones used), files and other relevant data relating to:

**Morgan, Lewis & Bockius LLP**

1701 Market Street
Philadelphia, PA  19103-2921          ☎ +1.215.963.5000
United States                         🖷 +1.215.963.5001

Madeline Davis
November 9, 2017
Page 2

- The recruiting and hiring of Madeline Davis by Stryker;

- Globus and/or its customers, prospective customers, contracts, and/or business opportunities;

- Madeline Davis's job duties at Stryker;

- Any contracts or agreements between Madeline Davis and Stryker; and

- Documents and information taken from Globus.

Failure to comply with this notice may result in severe sanctions and potential liability for spoliation of evidence.

The duty to preserve documents and information extends to all relevant paper documents, electronic data, and electronic media. The law requires that Stryker take every reasonable step to preserve all relevant information from any computer systems, removable electronic media, and other locations. This includes, but is not limited to, email and other electronic communication, word processing documents, spreadsheets, databases, calendars, telephone logs, information contained in business contact manager programs, internet usage files, and network access information. Stryker must also preserve the following platforms of electronic data containing relevant information: databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, disks, drives, cartridges and other storage media, CDs, DVDs, portable thumb and flash drives, hard disks, ZIP disks, laptops, personal computers, internet data, personal digital assistants (PDAs), handheld wireless devices, mobile telephones, paging devices, and audio systems (including voicemail). hard drives, laptops, PDA's, computer servers, and other electronic processing devices.

As used here, email includes emails sent or received on Stryker email systems or personal email accounts (such email accounts maintained through gmail, yahoo, hotmail, Blackberry messenger or any other internet service provider or social media network such as Facebook and LinkedIn). In addition, documents include text messages through any telephone service provider. Stryker must not overwrite, delete or destroy relevant electronic data on any computer or electronic storage location and must take steps to protect such data from being deleted or destroyed in the normal course of business operations or otherwise.

If there is any interest in resolving this matter short of litigation, please have your counsel contact me at 215-963-5077 or sarah.bouchard@morganlewis.com.

Sincerely,

Sarah E. Bouchard

SEB//bjb

# EXHIBIT 5

**Aliyya Rizley**

**Associate Legal Counsel, Employment**

**stryker**®

2825 Airview Blvd.
Kalamazoo, MI  49002 USA
P 269 389 7658
F 269 385 2066

aliyya.rizley@stryker.com

November 14, 2017

<u>**SENT VIA EMAIL**</u>

Sarah E. Bouchard
sarah.bouchard@morganlewis.com

        Re:     Madeline Davis

Dear Ms. Bouchard:

I am in receipt of your November 9, 2017 letter regarding Madeline Davis' employment with Stryker and post-employment obligations to Globus.

Ms. Davis will be employed by Stryker as an Advanced Operations Project Engineer. In that capacity, Ms. Davis will be responsible for design transfer and validation of an orthopedic product that has already been designed by Stryker. It is my understanding that the validation process is a standard one that does not require the use of any confidential or proprietary information. It is my further understanding that, during her time with Globus, Ms. Davis worked as a Project Engineer in new product development. Ms. Davis will not have any responsibility for new product development at Stryker at this time.

Indeed, consistent with the Non-Competition and Non-Disclosure Agreement between Ms. Davis and Globus, for a period of eighteen (18) months following the date that Ms. Davis ended her employment with Globus, Ms. Davis will not participate in competitive new product development activities at Stryker. Further, Stryker has not received and will not request or accept any Globus Confidential information from Ms. Davis.  Ms. Davis was hired for her general skills and knowledge rather than any confidential or proprietary information that she may have had access to or possessed prior to her relationship with Stryker and has been specifically instructed by Stryker to return any and all confidential information belonging to Globus.

Stryker is confident that Ms. Davis' role with Stryker falls outside of the restrictions articulated in her Agreement with Globus. Please feel free to reach out to me directly with any additional questions or concerns.

        Sincerely,

        Aliyya Rizley

# EXHIBIT 6

# Morgan Lewis

**Brandon J. Brigham**
Associate
+1.215.963.4780
brandon.brigham@morganlewis.com

November 14, 2017

**VIA EMAIL**

Aliyya Rizley
Associate Legal Counsel, Employment
Stryker
2802 Airview Blvd.
Kalamazoo, MI 49002

Dear Ms. Rizley:

We write in response to your November 14, 2017 correspondence regarding Stryker's recent hire, Madeline Davis. In short, your correspondence fails to alleviate any of our concerns regarding Ms. Davis's employment with Stryker. In fact, it only cemented that Ms. Davis's employment with Stryker violates her Non-Competition and Non-Disclosure Agreement (the "Agreement") that she signed with Globus Medical, Inc. ("Globus").

Based upon your correspondence, Ms. Davis's job functions and responsibilities at Stryker are very similar to those that she performed for Globus. Indeed, Stryker now represents that Ms. Davis will be an "Advanced Operations Project Engineer." In other words, Ms. Davis would seek to optimize a finished design for easier manufacturing. Yet nearly every product undergoes design changes as the product transfers from a prototype to manufacture. Ms. Davis's role, therefore, would require her to be involved in the design process for new products. Stryker would also rely on Ms. Davis's expertise in product design – expertise she developed at Globus – to appropriately design the new product for manufacture. Further, Ms. Davis would undoubtedly be interacting with the product design team in her role as "Advanced Operations Project Engineer" to ensure that any design changes needed for manufacture would not impact the product's suitability or performance.

We also note that Stryker failed to disclose in which division of Stryker Ms. Davis will be based. Your correspondence was intentionally vague and noted only that Ms. Davis will be working on an "orthopedic product." Of course, spinal implants fall within orthopedic products. As you know, Globus is a leading musculoskeletal implant manufacturer and competes with Stryker in this marketspace. Undoubtedly, if Ms. Davis worked on a spinal orthopedic product at Stryker, she would be engaged in competitive activity in violation of her Agreement.

While we remain willing to resolve this matter short of litigation, the assurances you provided fall well short of any meaningful resolution. We intend to file suit by **Friday, November 17** to protect Globus's interests. If there is any interest in resolving this matter short of litigation, please

**Morgan, Lewis & Bockius** LLP

1701 Market Street
Philadelphia, PA  19103-2921          ☏ +1.215.963.5000
United States                              🖷 +1.215.963.5001

Aliyya Rizley
November 14, 2017
Page 2

contact me at 215-963-4780.

Sincerely,

Brandon J. Brigham